IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DERYL WAYNE MADISON,               §
           Petitioner,           §
                                         §
v.                                 §         CIVIL ACTION NO. H-01-766
                                         §
NATHANIEL QUARTERMAN,              §
Director, Texas Department of       §
Criminal Justice, Correctional      §
Institutions Division,              §
           Respondent.           §

## MEMORANDUM AND ORDER

      Deryl Wayne Madison ("Madison"), a Texas prisoner incarcerated under a capital conviction and death sentence, filed a federal petition for a writ of habeas corpus on May 15, 2002. [Doc. # 24]. Madison's petition raises a single claim: that the State of Texas did not give his jury an opportunity to act on all his mitigating evidence. This Court has stayed adjudication of this case for an extended period while the Supreme Court and Fifth Circuit solidified the jurisprudence stemming from *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*"). The Petition is now before the Court on Madison's motion for summary judgment [Doc. # 40] and Respondent Nathaniel Quarterman's cross-motion for summary judgment [Doc. # 42]. After reviewing the record and the relevant law, the Court concludes that Madison's petition entitles him

to federal habeas relief.

Madison is in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division, pursuant to a judgment and sentence of death from the 176th Judicial District Court of Harris County, Texas, in Cause No. 498,916.  Trial testimony and Madison's confession established that on April 2, 1988, he brutally murdered 81-year-old Beulah Jolivet and then stole property from her home to purchase cocaine.[1]  Madison provided three written confessions to the murder.  The State of Texas tried Madison before a jury upon a plea of not guilty.  On June 19, 1989, the jury found him guilty of capital murder.

### *Testimony and Evidence from the Punishment Phase of Trial*

In a separate punishment phase, the jury considered evidence from both parties before answering Texas' special issue questions.  Special Issue No. 1, the "deliberateness" question, asked: "Was the conduct of the defendant, Deryl Wayne Madison, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?"  Trial Transcript ("Tr.") Vol. I-C, at 934.  Special Issue No. 2, the "future dangerousness" question, asked: "Is there a probability that the defendant, Deryl Wayne Madison, would commit criminal acts of violence that would constitute a continuing threat to

---

[1]     The Court of Criminal Appeals on direct appeal adequately summarized the facts of the murder.  *See Madison v. Texas*, No. 70,900, at 1-2 (Tex. Crim. App. June 23, 1993).   For purposes of this Memorandum, the Court need not address those facts in any detail.

society?"  Tr. Vol. I-C, at 934.  Although no court at the time of Madison's trial had found that Texas' special issue questions limited a jury's review of mitigating evidence, trial counsel requested a specific instruction for the jury to consider his punishment phase evidence.  Tr. Vol. I-C, at 907-09.  The trial court refused to give the proposed instruction.  Neither the special issues nor the jury instructions specifically authorized the jury to consider Madison's mitigating evidence.

The State's punishment phase case focused on Madison's lengthy criminal record, including his convictions for arson, trespassing, possession of a firearm, prostitution, indecent exposure, and theft.  The prosecution introduced into evidence Madison's confessions to several incidents of arson.  The prosecution generally attempted to prove Madison's nonconformance to society's laws and expectations.

Madison's federal habeas petition argues that Texas' special issues prevented the jury from giving effect to his punishment phase evidence, specifically his low I.Q., his substance abuse, his "pathogenic" home environment, and his psychological disorders.  Madison called two punishment-phase witnesses: Dr. Wendall Dickerson and Dr. James Marquart.  Dr. Marquart, a professor of criminal justice at Sam Houston State University, testified about the jury's role in predicting future dangerousness in capital cases.  While Dr. Marquart questioned Madison's future threat to society, he only did so based on general trends, not on an individual review of the facts of

Madison's case.[2]

The primary mitigating evidence in this case came through Dr. Dickerson's testimony. Dr. Dickerson, a licenced psychologist, had previously been the chief mental health officer for the Texas Department of Corrections. In that capacity, he oversaw evaluations of all death row inmates and appraised their competency for execution. Dr. Dickerson's testimony served two purposes. First, similar to Dr. Marquart's testimony, Dr. Dickerson explained general trends in inmate violence and its relationship to a prediction of future dangerousness. Second, and more important, Dr. Dickerson identified various factors in Madison's life that mitigated against a death sentence and signaled a likelihood that he would not pose a future societal danger. After reviewing Madison's records, performing psychological testing, interviewing Madison, and talking with his family members, Dr. Dickerson found "several diagnoses that are applicable" to Madison, including substance abuse, "unsocialization" or a

---

[2]   Dr. Marquart had studied the violent acts committed by those convicted of capital murder and found it impossible for a jury to make an accurate prediction of future dangerousness. Specifically, Dr. Marquart found juries to be wrong 80% of the time in their prediction. Tr. Vol. 21, at 384. The essence of Dr. Marquart's testimony was that Texas should abolish its reliance on future dangerousness in capital sentencing. Texas courts have routinely refused to allow Dr. Marquart's testimony to come before the jury. The Fifth Circuit has found that "Marquart's testimony comment[s] on Texas law, without addressing [the defendant's] specific danger to society. His opinion of Texas law add[s] nothing to the jury's consideration of the special issues." *Alexander v. Dretke*, 152 Fed. App'x 387, 390 (5th Cir. 2005); *see also Green v. Johnson*, 116 F.3d 1115, 1126 (5th Cir. 1997) (finding no error in the exclusion of Dr. Marquart's "generalized critique of the accuracy of the future dangerousness prediction"). Madison does not argue that Dr. Marquart's testimony was beyond the scope of the special issues.

social personality disorder, and a "disassociate personality disorder."  Tr. Vol. 21, at 297.

Madison now contends that the jury could not give full mitigating effect to Dr. Dickerson's testimony.

**Substance Abuse.** — At trial, Madison attributed Ms. Jolivet's murder, at least in part, to his substance abuse.  In one of his statements to the police, Madison confessed "the reason I did it was the cocaine.  I was high when this happened."  Tr. Vol. 24, State's Exhibit 2, Statement of Deryl W. Madison dated 4/9/1988.  Dr. Dickerson testified that substance abuse was "a major problem in his life" and "without the substance abuse [Madison] probably wouldn't have killed anybody."  Tr. Vol. 21, at 297, 321; *see also* Tr. Vol. 21, at 330.  Dr. Dickerson explained that Madison's substance abuse probably began in eighth or ninth grade, but possibly before then.  Tr. Vol. 21, at 298.  Madison initially abused alcohol and marijuana, but later progressed to crack cocaine, heroin, and methamphetamine.  Madison lived a "pretty rough street life" using crack cocaine before the murder.  Tr. Vol. 21, at 315.  Dr. Dickerson testified that crack cocaine makes a user "irritable, more suspicious, alternate between periods or elation and depression.  May become paranoid; easily agitated."  Tr. Vol. 21, at 299.  According to Dr. Dickerson, substance abuse "would tend to reduce his judgment and erode[] emotional control[.]" Tr. Vol. 21, at 294.  Beyond the immediate

effects of substance abuse, Dr. Dickerson testified that

> these psychotive drugs may have a residual effect in terms of changes in
> body chemistry and brain function that go on and on and on. . . . . We do
> know microeletra-encephalographers[,] people that put wires on your
> head and hook[] you up to the graphs[,] tell me that they can permanently
> identify changes in the brain function of individuals who have been off
> into street drugs.  That doesn't mean they're always messed up but there
> are lasting effects to doing that stuff.

Tr. Vol. 21, at 300.

Before closing arguments, trial counsel unsuccessfully requested that the trial

court instruct the jury on a voluntary intoxication defense.  Tr. Vol. 22, at 3-4.  Trial

counsel's closing argument discussed Madison's substance abuse, placing opprobrium

on society for Madison's drug problem.  Trial counsel lamented the fact that the war

on drugs failed to provide any treatment for the poor areas ravaged by drug problems,

while affluent drug users could pay for rehabilitation.  Tr. Vol. 22, at 33-34.  Trial

counsel highlighted how Madison never received support or treatment for his persistent

addiction.[3]  While acknowledging the limitations of drug use as a mitigating defense in

---

[3]       The defense argued as follows:

> He gets out of T.D.C. seven years older, not in any better condition, goes to
> welding school unable to get a job.  Causes a depression and hits the streets
> right about the same time just as society in general is experiencing a
> tremendous problem with crack cocaine.  So it's not hard to see how he might
> get caught up in that downward spiral and I think that it's obvious to people
> that once that cycle begins unless you have strong friends or family members,
> somebody to come in and break that spiral, to intervene, to try to start a
>                                                                        (continued...)

this case, trial counsel urged the jury to actuate that evidence in a non-aggravating

manner:

> We have to look at the individual . . . and what his background is.  In
> question number two . . . the things that you can take into consideration
> – often the biggest fear is that the mitigating factors – as the jury charge
> tells you that you can take all the evidence in consideration in arriving at
> your verdict and often the mitigating factors such as drug background,
> low IQ, broken family, the use of drugs often can be aggravating factors
> because we don't like that.  We don't know how to deal with it.  So the
> easiest way to deal with it is to push the person, let the executioner kiss
> his arm with a needle and we don't have to worry about him.  But often
> that shows no imagination because often criminals when they have run out
> of imagination of how to deal with their problems and they're backed up
> against the wall, they kill and the State's not asking you much more
> because they're asking you not to have any imagination, to give up and do
> basically the same thing by answering question number two yes and I
> hope you don't do that in this case.

Tr. Vol. 22, at 29-30.

The prosecution rebutted trial counsel's attribution of Madison's drug problem

to society: "[Trial counsel] says there's nobody out there in Fifth Ward to help

someone who uses crack cocaine.  That's because Aunt Beulah Jolivet isn't there

---

[3]      (...continued)
>         different course of action, that that spiral doesn't stop by itself.  That it goes
>         out of control until some tragic act happens to cause this person to more or
>         less just bottom out and that's what we have here.  Thank heavens most
>         people don't bottom out with a tragic act in the sense that we have here.  In
>         something this senseless[.]  [B]ut its only once that they bottom out or once
>         this spiral stops that there's any hope, there's any opportunity for some type
>         of treatment to begin.

Tr. Vol. 22, at 18-19.

anymore.  It's because she's dead.  She was helping him. She was doing everything humanly possible to try and help him."  Tr. Vol. 22, at 45-46.  The prosecution argued that Madison's drug usage did not mitigate against a death sentence.  Tr. Vol. 22, at 46.

*Troubled Childhood.* — Dr. Dickerson explained to the jury that Madison grew up in a turbulent home that severely affected him and his siblings.  Dr. Dickerson conveyed in outline form some information he received from Madison concerning his poor home life, though Dr. Dickerson indicated that he received "a good deal of conflicting report[s]" from family members about the severity of the family's problems. Tr. Vol. 21, at 301.[4]  Madison viewed his home as an "extraordinarily threatening environment" where "he and other family members were beaten, severe drunkenness on the part of the father, compulsive gambler, these kinds of things."  Tr. Vol. 21, at

---

[4]    On cross-examination, Dr. Dickerson stated that Madison in some instances had a different recollection than other family members and "talked more critically about his father than the other members of the family did[.]"  Tr. Vol. 21, at 347.  Dr. Dickerson readily admitted that his siblings "paint[ed] somewhat of a rosier picture."  Tr. Vol. 21, at 301.  Nevertheless, Dr. Dickerson seemingly based his opinion of Madison's home life more on the problems experienced by the Madison children later in life than on any intimate knowledge of what happened in that household.  Dr. Dickerson made this clear when he stated:

> The outcome in this family suggests – what we do know is one brother, just a couple of months ago apparently did die of aides [*sic*] and was a homosexual.  Two sisters are both acknowledged to have significant drug abuse of their own.  Out of four children we have four children with serious problems and I think that is the clearest evidence of all that we had a very pathogenic environment there.

Tr. Vol. 21, at 301.

301.   Dr. Dickerson testified that Madison grew up with a  "primitive[] kind of association" in a "household where anger and distress [was] the mode[.]"  Tr. Vol. 21, at 302, 355.  Dr. Dickerson opined that, as Madison was "frustrated because of the difficult life that he had with his family," he did not learn appropriate ways to channel anger and instead began setting fires at age 11.  Tr. Vol. 21, at 305.[5]

Dr. Dickerson explained that Madison's troubled background contributed to his psychological disorders.  Tr. Vol. 21, at 297.  This background left Madison "pretty much a loner beyond probably the four[th] or fifth grade."  Tr. Vol. 21, at 303.  Dr. Dickerson could not "identify any real close associations that he has had outside his family" after that point.   Tr. Vol. 21, at 303.[6]  Dr. Dickerson pointedly linked Madison's poor upbringing to his inappropriate displays of anger.  Tr. Vol. 21, at 303. Dr. Dickerson testified that Madison's difficult family life caused his obsession with arson as a means of gaining "a certain amount of situational control[.]"  Tr. Vol. 21, at 305, 364.  Dr. Dickerson opined that Madison's prior incarceration did not adequately

---

[5]      Dr. Dickerson clarified that the Federal Bureau of Investigation does not classify arson as a crime of violence.  Tr. Vol. 21, at 291.  While Dr. Dickerson considered Madison's arson an "aggressive" behavior, he testified that it was an impulsive activity not meant to harm anyone else.  Tr. Vol. 21, at 321-23.  Dr. Marquart testified that arson could be an act of violence. Tr. Vol. 21, at 388.  During its punishment-phase deliberations, the jurors sent out a note asking whether Texas statutes or court decisions considered arson a violent crime.  Tr. Vol. I-C, at 915.  The trial court refused to instruct the jury on anything outside the jury instructions.  Tr. Vol. I-C, at 915.

[6]      Notwithstanding his inability to socialize adequately with other people, Dr. Dickerson noted that Madison "love[d] dogs" and could establish a "kind" relationship with animals.  Tr. Vol. 21, at 304.

resolve the problems stemming from his poor home life, though it curbed his desire to commit arson.  Tr. Vol. 21, at 306, 309.

Trial counsel's closing argument encouraged the jury to "look at the individual . . . and what his background is."  Tr. Vol. 22, at 29.  Trial counsel's "biggest fear" was that the jury would give mitigating factors, including a "broken family," only aggravating effect.  Tr. Vol. 22, at 29; *see also* Tr. Vol. 22, at 35 ("And the mitigating factors may be the aggravating factors that may make you want to send him to prison.").  Nevertheless, trial counsel encouraged the jury to use "imagination" and give effect to Madison's mitigating circumstances, particularly under the second special issue.  Tr. Vol. 22, at 29-30.

***Psychological Problems.*** — Dr. Dickerson diagnosed Madison with two psychological disorders: a dissociative personality disorder and an asocial personality disorder.[7]  Dr. Dickerson also mentioned, without elaboration, that Madison "had IQ in the eighties."  Tr. Vol. 21, at 320.[8]  Dr. Dickerson explained the nature of Madison's

---

[7]   On cross-examination, Dr. Dickerson distinguished between Madison's asocial behavior and an "anti-social personality disorder" or being a "socio-path."  Tr. Vol. 21, at 222.  When the prosecution attempted to show that Madison suffered from an anti-social disorder, Dr. Dickerson testified that the prosecution "misappl[ied]" those standards.  Tr. Vol. 21, at 337. Even to the extent that Madison could be characterized as a sociopath, Dr. Dickerson testified that two-thirds of those suffering from that disorder improved by age 40.  Tr. Vol. 21, at 340.

[8]   Respondent argues that Madison did not exhaust his claim that the jury could not consider his IQ in the context of the special issues.  Madison's appellate brief did not include any
(continued...)

dissociative personality disorder:

> It means that conditions of his life have been sufficiently stressful.  What he does is he fragments parts of himself.  One piece of himself can be completely unaware of what the other part is doing.  Most extreme form of this that you will see will be the so called multiple personality disorders.  The movie Cybil was about such person which there were many compartments to her personality and I think [Madison] has more than a touch.  He's not multiple personality but he has a hard time understanding the connection between how he feels and what he does.  He has very little insight in that respect.

Tr. Vol. 21, at 297-98.  Madison's asocial personality disorder meant "he has not learned how to be a human being in quite the same way as other people did and a lot of the necessities, the things that we teach people in terms of manners and consideration and those kinds of things did not get transmitted in the same fashion."  Tr. Vol. 21, at 302.  Because as a child Madison had been taught never to become angry, his asocial personality disorder manifested in inappropriate expressions of anger.  "The problem is he has a problem with not being able to connect his anger and his actions in any kind of effective and appropriate kind of way."  Tr. Vol. 21, at 355.  Dr. Dickerson explained that the disorder caused Madison to display unwarranted anger

---

[8]       (...continued)
explicit reliance on low IQ evidence, but argued that "the jury was unable to fully consider and give effect to the mitigating evidence of [his] mental and emotional state and abused background in answering the two special issues."  Brief for Appellant, filed in the Court of Criminal Appeals on June 28, 1990.  In its opinion, the Court of Criminal Appeals mentioned that "[t]esting showed [Madison's] I.Q. to be in the eighties," but never analyzed his low intelligence evidence as a separate category of evidence for review under *Penry I*.  This Court will address Madison's IQ as one component of his mental health mitigation defense.

and to express that emotion in "uncontrolled and impulsive kinds of ways."  Tr. Vol. 21, at 302-03, 322-23.

Dr. Dickerson testified that Madison could receive treatment while incarcerated. "They're getting to the point now where they're doing I think an excellent job at T.D.C. of taking care of people who are in an acute distress . . . [with] mental illness as part of their difficulties."  Tr. Vol. 21, at 311.  Dr. Dickerson, however, was concerned that they "need to do some things differently because we've got too many folks going through the revolving door."  Tr. Vol. 21, at 311.  Dr. Dickerson stated that rehabilitation of Madison was "possible."  Tr. Vol. 21, at 319.  Dr. Dickerson expressed hope that new legal changes would improve further the treatment of mentally ill offenders.  Tr. Vol. 21, at 311-12.

Summarizing his findings, Dr. Dickerson testified that Madison would be "a moderate risk for future violent activity[,]" with a statistical probability that would "range somewhere between ten and maybe sixteen-seventeen percent."  Tr. Vol. 21, at 317.[9]  Dr. Dickerson testified that Madison would be most likely to commit an arson

---

[9]      On redirect, Dr. Dickerson gave a more emotional response about whether or not Madison would be a future danger:

> I'm certainly not telling y'all that [Madison] is any angel because he's not but you know as such things run . . . I've been in a room with people that made your hair stand on end and I've been with people that we recognize they're messed up and they're weak and they don't have a lot going for them and you
>
> (continued...)

than a murder if he were released and would not pose a threat to inmate society when incarcerated.  Tr. Vol. 21, at 318-19.  Dr. Dickerson explained that Madison "would be a run of the mill convict."  Tr. Vol. 21, at 319.  In the defense closing arguments, trial counsel argued that Madison was "rehabilitative."  Tr. Vol. 22, at 19-20.

Madison's jury answered Texas' special issues in a manner requiring the imposition of a death sentence.  The trial court sentenced Madison to death on June 23, 1989.

### *The Background of Madison's Claim in the Context of* **Penry** *Jurisprudence*

Recent cases have already discussed *Penry* jurisprudence in great detail.  *See, e.g., Abdul-Kabir v. Quarterman*, ___ U.S. ____, 127 S. Ct. 1654 (2007); *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006).  This Court need not repeat the complete constitutional and legal history of the *Penry* line of cases.  Nonetheless, a brief overview of the *Penry* landscape places Madison's state and federal proceedings into a broader context.

---

9          (...continued)
           recognize they may get off into something but your hair doesn't stand on end
           to be in the same room with them. [Madison] is at risk I believe but I'm trying
           to differentiate the level of risk for you.  I mean, he's not one of those that
           make my hair stand up but I also recognize that he doesn't have a whole lot
           going for him.  So it's a lot easier for him to get into stuff than it is for some
           other folks.

           Tr. Vol. 21, at 365.

Without comprehensively addressing its application to Texas' capital sentencing scheme, by the time of Madison's trial the Supreme Court firmly held that a jury must be empowered to give effect to a defendant's mitigating evidence. *See Lockett v. Ohio*, 438 U.S. 586, 602 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-05 (1976). Only three days after Madison's jury returned its punishment phase verdict, the Supreme Court held that Texas' then-effective system did not always provide an effective vehicle for considering some mitigating evidence. *See Penry I*, 492 U.S. at 327-28. In *Penry I*, the Supreme Court found that some elements of that defendant's mental retardation and child abuse evidence transcended the jury's specific inquiry under the special issues. Penry's evidence (1) had a mitigating thrust that went beyond the deliberateness question and (2) became a "two-edged sword" because the future dangerousness question only gave it aggravating effect. "In order to ensure 'reliability in the determination that death is the appropriate punishment in a specific case,'" *Penry I* required that "the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Id.* at 328 (quoting *Woodson*, 428 U.S. at 305)).

Interpreting *Penry I* to require the submission of a mitigation instruction in all capital cases, Madison timely moved for a new trial. Tr. Vol. I-C, at 966-68. After considering the parties' arguments, the trial court noted that Madison's case may be

"one of these situations where there may be distinguishing facts, distinguishing situations." Tr. Vol. 23, at 9. The trial court denied Madison's motion for a new trial, holding that the special issues provide the jury with a "sufficient opportunity . . . to consider the evidence submitted[.]" Tr. Vol. 23, at 16.

The trial court's recognition of differences between Penry's exceptional evidence and that which is generally actionable under the special issues foreshadowed the significant confusion that would flow from *Penry I*. Courts subsequently struggled with how to interpret the contours of that case.[10] Nothing in *Penry I* signaled a wholesale rejection of Texas' special issues, yet the Supreme Court failed to articulate how to determine what evidence evaded Texas' sentencing review. The Fifth Circuit and Texas courts, therefore, grappled with deciding "by what principle should the line between *Penry I* and non-*Penry I* evidence be drawn?" *Robertson v. Cockrell*, 325 F.3d 243, 251 (5th Cir. 2003). Eventually, the *en banc* Fifth Circuit in *Graham v. Collins*, 950 F.2d 1009 (1992), outlined the principles that it would later distill into a "constitutional-relevancy test." Under this test, the Fifth Circuit denied all *Penry* claims before 2002. *See Robertson*, 325 F.3d at 256.[11]

---

[10]   The Texas courts used a stop-gap jury instruction until the Texas Legislature crafted a special issue that explicitly authorized the jury to consider all mitigating evidence.

[11]   The Fifth Circuit found special support because the Supreme Court affirmed one of the formative cases in establishing its *Penry* tests, *Graham v. Collins*, 950 F.2d 1009 (5th Cir. 1992), and distinguished *Penry I* in subsequent cases. The Fifth Circuit long relied on *Johnson v. Texas*, 509 U.S. 350 (1993), and *Graham v. Collins*, 506 U.S. 461 (1992), to

(continued...)

During this time period, Madison first raised his *Penry* claim on direct appeal

from his conviction and sentence. *See Madison v. Texas*, No. 70,900 (Tex. Crim. App.

June 23, 1993). The Texas Court of Criminal Appeals' review provided two reasons

for rejecting Madison's *Penry* claim. First, the Court of Criminal Appeals expressed

doubt as to the accuracy of Madison's mitigating evidence. Particularly, the Court of

Criminal Appeals noted that no independent evidence corroborated the facts that

Madison conveyed to Dr. Dickerson. Second, the Court of Criminal Appeals

referenced earlier cases finding that the categories of evidence Madison presented did

not warrant a *Penry* instruction. While not expressly relying on the Fifth Circuit's

"constitutional relevancy test," the Court of Criminal Appeals' adjudication engaged

the same essential features as that review.[12] A vigorous dissent criticized both the

majority's "scatter-shot" efforts to distinguish Madison's evidence from *Penry I* and

the weighing of the evidence to see if it warranted a supplemental instruction.

On February 12, 2001, Madison filed a motion for appointment of counsel in

---

[11]     (...continued)
deny relief in *Penry* cases.

[12]     Madison also raised his *Penry* claim on habeas review. State Habeas Records, at 22-27.
Because the Court of Criminal Appeals resolved Madison's *Penry* claim on direct review, the
state habeas court found his habeas allegation to be "essentially an out-of-time motion for
rehearing or request that the Court of Criminal Appeals reconsider its interpretation of
*Penry*[.]" State Habeas Record at 177-78. The Court of Criminal Appeals rejected Madison's
request for habeas relief in an unpublished order. *Ex parte Madison*, No. 498916-A (Tex.
Crim. App. Sept. 24, 1997).

federal court [Doc. # 1].  On February 22, 2001, this Court stayed Madison's execution to allow the presentation of a federal habeas petition [Doc. # 6].  This Court later found that rare and unusual circumstances forgave Madison's failure to file a timely federal petition.  [Doc. # 19].  Madison filed his federal habeas petition on May 15, 2002 [Doc. # 24].

In 2001, the Supreme Court again revisited Texas' review of mitigating evidence, this time in the case that resulted from Johnny Paul Penry's retrial.  In *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"), the Supreme Court reiterated that "a sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances."  532 U.S. at 797 (quoting *Johnson v. Texas*, 509 U.S. 350, 381 (1993) (O'Connor, J., dissenting)).  *Penry II* put into doubt pertinent Fifth Circuit precedent.  In response to *Penry II*, the Fifth Circuit issued conflicting opinions concerning the state of *Penry* jurisprudence.  *Compare Robertson v. Cockrell*, 279 F.3d 1062 (5th Cir. 2002), *with Tennard v. Cockrell*, 284 F.3d 591 (5th Cir. 2002), *Dinkins v. Cockrell*, 34 Fed. App'x 963 (5th Cir. 2002) (unpublished), *and Patrick v. Cockrell*, 34 Fed. App'x 150 (5th Cir. 2002) (unpublished).  This Court, therefore, stayed adjudication of this case until the appellate courts decided how to proceed in cases raising *Penry* issue.

In 2004, the Supreme Court rejected the Fifth Circuit's "constitutional relevancy

test" as a "restrictive gloss on *Penry I*." *Tennard v. Dretke*, 542 U.S. 274, 283 (2004).

The *Tennard* court found that the Fifth Circuit's precedent "ha[d] no foundation in the

decisions of [the Supreme] Court." *Id.* at 284.  The *Tennard* court instead indicated

that a review of whether a jury could adequately consider mitigating evidence involves

two factors.  First, a court must decide whether the defense presented "relevant"

mitigating evidence, a much lower threshold determination than the "constitutionally

relevant test" espoused by the Fifth Circuit.  *Id.* at 284.[13]  Second, the Supreme Court

reiterated that the ultimate inquiry in a *Penry* case was whether the defendant's

evidence had "mitigating dimension beyond" the special issue questions.  *Tennard*, 542

U.S. at 288; *see also Smith v. Texas*, 543 U.S. 37, 43-45 (2004) (reaching the same

result in a case on certiorari review from the Texas Court of Criminal Appeals).

    The Fifth Circuit gave a mixed response to *Tennard*.  The Fifth Circuit jettisoned

its previous constitutional relevancy test.  The Fifth Circuit, however, repeatedly

distinguished petitioners' evidence from that presented in *Penry* and *Tennard*.  *See,*

*e.g., Brewer v. Dretke*, 442 F.3d 273 (5th Cir. 2006); *Summers v. Dretke*, 431 F.3d 861

(5th Cir. 2005); *Cole (Abdul-Kabir) v. Dretke*, 418 F.3d 494 (5th Cir. 2005).  The Fifth

---

[13]    The Supreme Court defines "relevant mitigating evidence" as "evidence which tends logically
to prove or disprove some fact or circumstance which a fact-finder could reasonably deem
to have mitigating value." *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990).  This inquiry
asks whether the defendant presented "[e]vidence that might serve as a basis for a sentence
less than death." *Tennard*, 542 U.S. at 285 (quotation omitted).

Circuit continued to apply *Penry I* in a limited manner, requiring the special issues only to give a defendant's evidence "sufficient mitigating effect," not "full effect."

In 2006, the Supreme Court granted certiorari review on two Fifth Circuit cases that distinguished the *Penry I/Tennard* decisions. Thereafter, in December 2006, the *en banc* Fifth Circuit reversed a panel's denial of relief in *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006), adopting a more liberal reading of the *Penry I/Tennard* cases. Specifically, *Nelson* recognized that the *Penry* jurisprudence required that a jury be able to give an inmate's mitigating evidence "full effect." *See Nelson*, 472 F.3d at 291-93. In finding that Nelson's evidence of childhood abuse and neglect, substance abuse, troubled relationships and borderline personality disorder exceeded the contours of jury consideration under Texas' special issues, the Fifth Circuit set the stage for the Supreme Court's most-clear explanation of *Penry* jurisprudence in *Abdul-Kabir v. Quarterman*, ___ U.S. ____, 127 S. Ct. 1654 (2007),[14] and *Brewer v. Quarterman*, ___ U.S. ___, 127 S. Ct. 1706 (2007).

*Abdul-Kabir* and *Brewer* reaffirmed *Tennard*'s low-threshold relevance test. Once an inmate meets the relevance step, *Abdul-Kabir* and *Brewer* affirmed that "sentencing juries must be able to give meaningful consideration and effect to *all*

---

[14]    Dr. Dickerson also testified for the defense in *Abdul-Kabir*. His testimony in that case had the same mitigating thrust, and mitigating effect outside the special issues, as in Madison's case.

mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir*, ___ U.S. at ___, 127 S.Ct. at 1664 (emphasis added); *see also Brewer*, ___ U.S. at ___, 127 S. Ct. at 1713.  "[W]hen the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,'" a mitigation instruction is required. *Abdul-Kabir*, ___ U.S. at ___, 127 S.Ct. at 1668 n.14 .  Simply, "the jury must be allowed not only to consider such evidence, or to have such evidence before it, but respond to it in a reasonable, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death."  *Brewer*, ___ U.S. at ___, 127 S.Ct. at 1714.

The Fifth Circuit recently applied the *Nelson/Abdul-Kabir/Brewer* reading of *Penry* jurisprudence in *Coble v. Quarterman*, ___ F.3d ___, 2007 WL 2306905 *13 (5th Cir. Aug. 14, 2007).  The Fifth Circuit in *Coble* found that the jury may have been unable to consider the major mitigating thrust of the defendant's evidence of a troubled childhood, problems after military service, volunteer service, good relationship with others, post-traumatic stress disorder, and bipolar disorder.  *See Coble v. Quarterman.* ___ F.3d at ___, 2007 WL 2306905 at *14-15.

In light of the this legal landscape, the Court turns to the mitigating evidence

Madison presented at trial.

### *Application of* **Penry** *Jurisprudence to Madison's Mitigating Evidence*

Notwithstanding the recent developments in *Penry* jurisprudence, Respondent maintains that Madison has not shown entitlement to habeas relief.  Madison merits habeas relief under the Anti-Terrorism and Effective Death Penalty Act if the state court decision adjudicating the merits of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law[.]" 28 U.S.C. § 2254(d)(1). The 2007 Supreme Court and Fifth Circuit decisions establish that the Texas Court of Criminal Appeals based its decision on an unreasonable reading of *Penry I* and the Supreme Court's related jurisprudence.

Initially, the Texas Court of Criminal Appeals erred in discounting Madison's mitigating evidence because it found it weak, inconsistent, or unreliable.  *Penry* jurisprudence does not depend on the weight, strength, or consistency of mitigating evidence.  *See Brewer*, ___ U.S. at ___, 127 S.Ct. at 1712-13 (finding that *Penry* evidence is not "a matter purely of quantity, degree, or immutability"); *Nelson*, 472 F.3d at 310 ("[W]e may not conduct an independent review of the conflicting evidence in this case[.]").  A court's *Penry* review instead focuses on whether the mitigating evidence was relevant to the special issues and whether the jury could fully give effect to that evidence.  Contrary to the Texas Court of Criminal Appeals, this Court makes

no effort to weigh Madison's testimony.

This Court concludes that the Court of Criminal Appeals misapplied federal law when that court categorically assumed that Madison's evidence fell within certain classes of evidence that were subject to sufficient review under the special issues used in Madison's 1989 trial.  Under *Tennard*, Madison easily meets the "low threshold" for showing that his challenged mitigating evidence was relevant to the sentencing hearing.  *See Tennard*, 542 U.S. at 284.  Madison's evidence of his substance abuse, "pathogenic" home environment, psychological disorders, and low IQ are plainly "relevant" to his sentencing.[15]

Because Madison meets this relevance standard, the Eighth Amendment requires that the jury "be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future."  *Abdul-Kabir*, ___ U.S. at ___, 127 S.Ct. at

---

[15]    Madison's evidence is similar to that found relevant in recent Supreme Court and Fifth Circuit cases.  *See Abdul-Kabir*, ___ U.S. at ___, 127 S.Ct. at 1673-75 (assuming that the defendant's unhappy childhood and psychological testimony stemming from childhood abuse were relevant); *Brewer*, 127 S.Ct. at 1713-14 (assuming that the defendant's depression, manipulation, childhood abuse, and substance abuse were relevant); *Coble*, ___ F.3d at ___, 2007 WL 2306905 at *12 (finding that the defendant's troubled childhood, volunteer service, post-traumatic stress disorder, and other psychological disorders were relevant); *Nelson*, 472 F.3d at 305-06 (finding that a defendant's abusive childhood, substance abuse, troubled and unfulfilling relationships, and mental disorder were relevant).

1664; *see also Nelson*, 472 F.3d at 311.  Even after the recent *Penry* cases, Respondent doggedly maintains that Madison's evidence lacked meaningful mitigating relevance beyond the scope of the special issues.[16]  The Court must decide whether the jury may have felt compelled to answer the special issues in an affirmative manner even though the evidence made Madison less morally culpable.  *See Nelson*, 472 F.3d at 293; *see also Abdul-Kabir*, ___ U.S. at ___, 127 S.Ct. at 1668 n.4 (requiring a mitigation special issue when "the defendant's evidence may have meaningful relevance to the defendant's moral culpability beyond the scope of the special issues").

*Deliberateness Special Issue.* — The first special issue asked the jury to decide whether Madison acted deliberately, that is, "with the reasonable expectation that the death of the deceased or another would result."  Tr. Vol. I-C, at 934.  While some of Madison's evidence fell within the jury's purview under the deliberateness issue, a reasonable juror could have concluded that, though the murder was deliberate, Madison's mitigating evidence made him morally less culpable.  The Fifth Circuit in *Nelson* held that similar evidence of "a mental disorder and an abusive childhood . . . could reduce an offender's moral culpability" making it "'reasonably likely that a jury

---

[16]     In doing so, Respondent's most recent briefing relies heavily on the Fifth Circuit's now-discredited case law.  The Fifth Circuit cases Respondent cites indeed found similar categories of mitigating evidence *somewhat* actionable under Texas' special issues, but did so under the pre-*Tennard* constitutional relevancy test that did not require a *full* consideration of mitigating evidence.  Respondent does not meaningfully demonstrate the viability of pre-2004 Fifth Circuit cases after the recent elaboration of *Penry* jurisprudence.

would not have been able to give full effect to his 'reasoned moral judgment' regarding the full mitigating impact of [the defendant's] evidence though the narrowly worded deliberateness instruction." 472 F.3d at 306. The jury could have found Madison morally less culpable because his psychological disorders and long-term substance abuse diminished his ability to control his anger and actions, but the jury could not reasonably give effect to that information through the narrow deliberateness issue. The deliberateness issue may have allowed the jury to consider how Madison's drug use close to the time of the murder affected his actions, but did not enable the jury to consider if his judgment was impaired due to early and long term drug use. There is a reasonable likelihood that the jury could not give meaningful effect to Madison's evidence because it had mitigating dimension beyond the deliberateness special issue.

***Future Dangerousness.*** — The future dangerousness question asked if there "[i]s there a probability that . . . Madison . . . would commit criminal acts of violence that would constitute a continuing threat to society?" Tr. Vol. I-C, at 934. Madison's mitigating evidence raised a serious and potentially sympathetic defense. The jury could believe that Madison's substance abuse, which began early and possibly as a reaction to his turbulent household and abusive family relationships, exacerbated his pre-existing mental problems in a way that made him morally less culpable for the murder. Madison's difficult background may have engendered sympathy from the

jurors.  These reactions to the evidence, however, had little bearing on the second special issue.

Moreover, Madison's "mitigating evidence served as a 'two-edged sword' because it tended to confirm the State's evidence of future dangerousness as well as lessen his culpability for the crime." *Brewer*, ___ U.S. at ___, 127 S.Ct. at 1712. While Dr. Dickerson testified that Madison's mental disorders and substance abuse were amenable to treatment, placing them partially within the scope of the second special issue, his testimony also raised questions about the quality of treatment Madison would receive while incarcerated and his response to that treatment.  Even given adequate treatment, "the jury could have concluded that successful treatment of his mental illness was unlikely[.]" *Coble*, ___ F.3d at ___, 2007 WL 2306905 at *14; *see also Nelson*, 472 F.3d at 307 ("[E]ven assuming that Nelson's borderline personality disorder were treatable, success would depend on many factors.  Based on this evidence, the jury could have easily concluded that it was unlikely that Nelson would successfully complete treatment.").  The jury may also have thought that "as [Madison] aged and became more chronologically removed from his difficult childhood and traumatic experiences . . . his troubled background would exercise a lesser degree of influence over his actions, thereby rendering him less of a future danger." *Coble*, ___ F.3d at ___, 2007 WL 2306905 at *14.  However, given his age (29 years old), the

jury might have thought that Madison would not fall into the category of those who age out of crime.  The jury additionally could see Madison's fire setting as an indication that he would be violent in the future without a vehicle to consider those factors which led Madison to arson.  The special issues likely turned Madison's mitigating evidence into arguments against him on the future dangerousness issue.

The Constitution ensures that a jury cannot deliver a sentence of death without being able to consider fully and act on all a defendant's mitigating evidence. Madison's jury did not have a vehicle to give his mitigating evidence full effect.[17]  The Court of Criminal Appeals' reasoning in denying Madison's *Penry* claim mirrors the now-discredited constitutional relevance test.  Whatever validity that test may have seemed to have when the Court of Criminal Appeals considered Madison's direct appeal, Supreme Court precedent has now conclusively rejected such an approach. The Court of Criminal Appeals' decision was contrary to, and an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).  Madison has shown that it is reasonably likely that his sentencing jury could not act on his mitigating evidence.

Accordingly, the state trial court should have provided the jury an additional

---

[17]   Respondent asks this Court to find that any *Penry* error was harmless beyond a reasonable doubt.  The Fifth Circuit has expressly rejected the application of a harmless error standard in *Penry* cases.  *See Nelson*, 472 F.3d at 314-15.  Nonetheless, Respondent has not made a convincing argument that any *Penry* error did not influence the jury's verdict.

mitigation special issue.  Texas must hold a new sentencing hearing that provides for a full and fair review of mitigating evidence if it wishes to execute Madison.

### *Conclusion*

The Court grants Madison's motion for summary judgment and denies Respondent's cross-motion for summary judgment.  The Court conditionally grants a writ of habeas corpus.  A writ of habeas corpus shall issue unless within 180 days the State of Texas begins new sentencing proceedings against Madison *or* reforms his sentence to life imprisonment.  The 180-day time period shall not start until the conclusion of any appeal from this Memorandum and Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.

**SIGNED** this 27<u>th</u>  day of September, 2007, at Houston, Texas.

Nancy F. Atlas
United States District Judge